IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Alisa Locke, | ) | Civil Action No. 6:12-2751-DCN-KFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on April 22, 2011, alleging that she became unable to work that same day. The application was denied initially and on reconsideration by the Social Security Administration. On August 25, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and J. Adger Brown, an impartial vocational expert, appeared on January 19,

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

2012, considered the case *de novo*, and on February 29, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on July 21, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.
>
> (2)    The claimant has not engaged in substantial gainful activity since April 22, 2011, the alleged onset date (20 C.F.R § 404.1571 *et seq*).
>
> (3)    The claimant has the following severe impairments: multiple sclerosis, depression, and borderline intellectual functioning (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). Specifically, the claimant can lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; can push and pull within the given weight limits; can sit for up to six hours in an eight-hour workday with normal breaks; can stand and walk for up to two hours in an eight-hour workday with normal breaks; cannot climb ropes, ladders, or scaffolds; can occasionally climb ramps and stairs, balance, kneel, stoop, and crouch; cannot crawl; cannot perform overhead work; must

2

avoid exposure to hazards such as unprotected heights and dangerous, moving machinery; must have the option to sit or stand every 30 minutes to one hour; and is limited to simple, routine, repetitive tasks.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on August 21, 1970, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2; and compare Rules 201.18, 201.19, and 201.20).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from April 22, 2011, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

5

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

On June 24, 2009, the plaintiff was seen by Dr. Herold Nazon at Palmetto Family Care in follow-up for anemia, lab tests, numbness in the extremities and bilateral shoulder pain (Tr. 300-301). She was referred to neurology for her numbness and tingling.

On July 2, 2009, the plaintiff presented to a neurologist, Dr. Hamid Bahadori, complaining that she had been experiencing intermittent tingling and weakness for approximately two months (Tr. 295-96). An EMG/nerve conduction study and a spinal fluid study were normal, but MRIs of her brain and thoracic spine were consistent with demyelinating[3] disease (Tr. 287, 290). Additional impairments included blurry vision, irregular heart rate, arthritis, and easy bruising (Tr. 306-07). Dr. Bahadori tentatively diagnosed the plaintiff with multiple sclerosis (Tr. 289-90). A second neurologist, Dr. James Bumgartner, confirmed the diagnosis and started the plaintiff on a trial of gabapentin to treat her neurological symptoms (Tr. 287-88).

In October 2009, the plaintiff reported that the gabapentin had not helped her symptoms, which included intermittent tingling in her extremities and face and occasional pain. She reported no other problems and stated that her symptoms had not gotten worse, but that she had not "come back to her normal baseline" (Tr. 285). Upon physical examination, she showed 5/5 strength on the right side; -5/5 strength in the left upper extremity; +4/4 strength in the left lower extremity; intact vision, sensation, coordination, and reflexes; and normal gait. Dr. Bahadori prescribed Betaseron to treat the plaintiff's multiple sclerosis and recommended an MRI of the spine and chiropractic treatment (Tr. 286).

---

[3]Demyelination refers to damage to the myelin sheaths of nerves, which impairs their functioning. *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1860500/.

6

On October 13, 2009, the plaintiff filed for DIB, alleging disability beginning on September 28, 2009 (Tr. 139-45, 168-77). In January 2010, State agency physician Dr. Jim Liao reviewed the plaintiff's medical records and opined that the plaintiff could meet the exertional requirements of light work[4] (Tr. 318-25). Dr. Liao also opined that the plaintiff could frequently stoop, kneel, crouch, crawl, or reach in all directions; could occasionally balance and climb ramps or stairs; could never climb ladders, ropes, or scaffolds; and should avoid exposure to hazards such as machinery and heights (Tr. 320-22).

In April 2010, the plaintiff returned to Dr. Bahadori complaining of blurred vision in both eyes (Tr. 354). The plaintiff had been off Betaseron for three months and planned to start taking Avonex instead (Tr. 354). Dr. Bahadori recommended hospitalization for the plaintiff's reported eye problem, but she refused (Tr. 355). A physical examination revealed intact, 20/20 vision in both eyes, as well as full motor strength in the bilateral upper and lower extremities; intact sensation, reflexes, and coordination; and normal gait (Tr. 355). The plaintiff denied feeling depressed but reported that she was fatigued (Tr. 350). Dr. Bahadori scheduled an MRI, but the plaintiff "did not have it" (Tr. 350). From June 2010 through November 2010, the plaintiff's primary care physician, Dr. Nazon, noted that the plaintiff's multiple sclerosis was "stable" (Tr. 329, 331, 333). In October 2010, the plaintiff reported that medication was not helping her symptoms; however, she appeared normal upon physical examination (Tr. 330-31, 351). She denied feeling depressed or anxious (Tr. 330, 334-35, 350-51).

Dr. Bahadori saw the plaintiff on October 22, 2010, and noted that she reported a host of unpleasant side-effects from her Avonex injections (Tr. 334-35).

---

[4] To meet the exertional requirements for the full range of light work, a claimant must be able to do substantially all of the following activities: lift no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds; walk or stand for most of the workday (a total of approximately six hours of an eight-hour workday); and sit for most of the workday with some pushing or pulling of arm or leg controls. 20 C.F.R. § 404.1567(b); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6.

Specifically, she told Dr. Bahadori that she experienced muscle aches and insomnia. She had stopped the injections and then restarted them again. The side effects returned when she restarted the medication. Her actual multiple sclerosis symptoms were fairly well-controlled, but she did report some persistent numbness and occasional balance problems. She had muscle spasm, neck and back pain and was not sure whether this was from her multiple sclerosis or her arthritis. She was fatigued during the day and had been prescribed Adderall for this, which she said helped. She was uncomfortable with the amount of prescription medication she was taking. Dr. Bahadori concluded that the plaintiff should switch back to Betaseron treatment. He restarted her on Adderall. He opined that her muscle spasms were a symptom of her multiple sclerosis and recommended MRIs to evaluate the progress of that disorder (Tr. 334-35).

An October 2010 MRI of the plaintiff's cervical spine showed "patchy enhancement" in the right hemicord at C5-6, suggesting "active demyelination" that had not been detected in the July 2009 MRI study (Tr. 352). A contemporaneous brain MRI revealed no change since July 2009 (Tr. 353).

In March 2011, the plaintiff saw Dr. Bahadori. The plaintiff's multiple sclerosis was still stable, but she reported that Adderall had not helped her fatigue (Tr. 348-49). Her physical examination was normal (Tr. 349). The plaintiff reported that she had pain and discoloration of the skin around the injection site after administering Betaseron, but that she nonetheless continued to take it as directed. Dr. Bahadori noted discoloration on her stomach. Dr. Bahadori concluded that Betaseron was still better than the Avonex and directed her to continue. He felt that the underlying multiple sclerosis was actually stable and changed her from Adderall to Vyvanse.

On June 2, 2011, the plaintiff saw Dr. Bahadori again and complained of left shoulder and back pain for the past two weeks (Tr. 377-78). She also reported persistent fatigue. Diagnoses included sacroiliitis, possible cervical radiculopathy, vertigo/dizziness,

8

possibly from multiple sclerosis, and fatigue. She was given Tramadol for shoulder pain, and it was noted that she had been switched from Vyvase to Amantadine without improvement, but also with no negative side effects. A brain MRI on June 21, 2011, showed a new lesion (Tr. 383).

In August 2011, the plaintiff underwent a consultative mental status examination with Dr. Francis Fishburne (Tr. 389-93). She complained of multiple sclerosis, muscle spasms, blurred vision, depression, pain, and fatigue. She reported that her typical day involved tending to her personal hygiene, lying down, and getting something to eat, but that her activities were otherwise limited due to her poor memory and her inability to walk or stand for long. She said that she occasionally shopped, wiped down counters, and made sandwiches or microwave dinners, but that her husband and daughter did most of the household chores (Tr. 389). The plaintiff reported that she attended church on Sundays, but did not belong to any clubs or organizations; had no favorite television shows; did not read for pleasure; went to bed between 6:30 p.m. and 7:00 p.m.; and had difficulty falling asleep. She reported that she was depressed "all the time" and had suicidal thoughts, but no suicidal plan or intent. She said that she went out in public three or four times per month, but that crowds made her anxious. She received visitors twice per week and went out to visit others once or twice per week. The plaintiff reported problems with her memory, but no difficulties concentrating, understanding and following simple instructions, or getting along with others (Tr. 390).

Dr. Fishburne noted that the plaintiff was generally cooperative during the examination, "but not fully forthcoming when answering [his] questions." Her mood was depressed , her affect was flat, and her attention/concentration and short-term memory were "mildly impaired." Meanwhile, her attitude, orientation, behavior, motor activity, speech, thought processes, impulse control, and insight all appeared to be within normal limits, with no suicidal or homicidal thoughts (Tr. 390-91). Dr. Fishburne noted that the

9

plaintiff's effort level was "low" with respect to tasks designed to measure her judgment (Tr. 391). He diagnosed the plaintiff with "depression secondary to medical condition" and "borderline intellectual functioning" and assessed a Global Assessment of Functioning ("GAF") score of 70[5] (Tr. 391-92).

In September 2011, the plaintiff presented to Dr. Bahadori complaining of persistent face numbness and tingling, tiredness, and bilateral leg pain and weakness. She reported that she stopped taking several of her medications because they did not help, caused her chest pain, or decreased her appetite. She reported that Tramadol helped, but gave her "an unusual feeling" (Tr. 397). Dr. Bahadori noted that a recent MRI had shown a new 4mm plaque, and he opined that her facial numbness was probably related to her multiple sclerosis and did not respond much to treatment. He started her on Elavil for the numbness and tingling in her face and switched her back to Adderall for her fatigue. He change her pain medication from Tramadol to Lortab due to side effects. Her physical examination was otherwise normal (Tr. 397-98).

In January 2012, Dr. Bahadori completed a questionnaire in which he opined that the plaintiff's multiple sclerosis, though "stable," caused fatigue, balance problems, "numbness, tingling or other sensory disturbance," increased muscle tension, sensitivity to heat, pain, difficulty remembering, depression, and blurred vision (Tr. 400). In response to questions that tracked the language of 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.04B and 11.09C, Dr. Bahadori affirmed that the plaintiff experienced "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station" and "significant,

---

[5] A GAF of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000).

reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process."  To support those assertions, Dr. Bahadori noted: "problem especially [with] left hand lifting above shoulders or head; overall left side weaker than right," and "cannot do much exercising before being totally exhausted."  Dr. Bahadori could not identify any dates on which the plaintiff had suffered exacerbations of her multiple sclerosis.  He responded affirmatively to questions regarding whether the plaintiff "complain[ed] of a type of fatigue that is best described as lassitude rather than fatigue of motor function" and whether "this kind of fatigue complaint [is] typical of M.S. patients" (Tr. 401).  He opined that emotional factors did not contribute to the severity of the plaintiff's symptoms and functional limitations (Tr. 401).

With respect to mental limitations, Dr. Bahadori opined that the plaintiff's symptoms would frequently interfere with her attention and concentration and that she was incapable of even low-stress jobs because she "cannot withstand much activity before being 'wiped out.'"  He opined that the assessed limitations began as early as July 2, 2009 (Tr. 402).  With respect to physical limitations, Dr. Bahadori opined that the plaintiff could not walk even a city block without rest; could sit for only 10 minutes at a time and about two hours total during an eight-hour workday; could stand for only 10 minutes at a time and less than two hours total during the workday; required a job that would allow her to change positions at will; and required unscheduled 15- to 20-minute breaks every 20 to 30 minutes (Tr. 402-03).  Additionally, he opined that the plaintiff could not lift any weight; could never crouch or climb ladders; and could rarely twist, stoop, or climb stairs.  With her right hand, the plaintiff could grasp 80% of the day, finger 90% of the day, and reach 75% of the day.  With her left hand, the plaintiff could grasp 60% of the day, finger 80% of the day, and reach 50% of the day (Tr. 404).  According to Dr. Bahadori's questionnaire, the plaintiff was

11

required to avoid all exposure to extreme temperatures, humidity, air pollutants, and workplace hazards; avoid even moderate exposure to wetness; and avoid concentrated exposure to noise. Dr. Bahadori opined that the plaintiff would need to miss more than four days per month because of her medical condition (Tr. 405).

At her January 2012 hearing, the plaintiff testified that she had stopped working in March or April 2011 due to "health problems and, just overall, my condition." She had been working as a receptionist and administrative assistant at an insurance agency (Tr. 36-37; *see also* Tr. 279). She had worked similar jobs before and had also worked as a hairdresser. She testified that she lived with her husband, who worked, and that her cousin would occasionally come over to help around the house and to assist her with "a lot of the daily needs" (Tr. 37-38). The plaintiff testified that she occasionally drove, shopped for groceries, and did light housework, such as "wiping down tables." She testified that she experiences dizziness daily (Tr. 38-39). She reported that she had been seeing Dr. Bahadori for a couple years and that she had continuously been on medication since she was diagnosed with multiple sclerosis. The plaintiff complained that her Betaseron caused constant muscle aches, spasms, weakness, "and overall just extreme body aches and flu-like symptoms" (Tr. 39-40). She testified that she had experienced those side effects while she was still working as a receptionist, but that she had problems with regular attendance and took unscheduled breaks (Tr. 40-42). She said her multiple sclerosis itself caused "numbness in both legs, arms, and back," which had started the previous year, as well as numbness and tingling on the left side of her face, muscle aches, dizziness, fatigue, problems with balance, weakness (especially on the left side), which she characterized as "extremely weak," and insomnia. She also testified that there was no period of time since she was diagnosed with multiple sclerosis in July 2009 where she would have been able to work consistently (Tr. 42-43)

The plaintiff reported that she could stand for no more than 5 or 10 minutes and that sitting caused "extreme pain from [her] back on down to [her] legs." She was most comfortable spending her days in a recliner. She said she could lift "not a whole lot," but could carry a gallon of milk "with two hands." The plaintiff also reported problems with depression, remembering things, and staying on task (Tr. 45). She stated that she typically did "a little here and there," napped during the day, and went to bed between 7:00 p.m. and 8:00 p.m. (Tr. 46).

The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work history as the plaintiff, who has the capacity to perform work at the sedentary exertional level,[6] except that she was "limited to occasional postural activities, no climbing or crawling, would be limited to no overhead work, and would need to avoid all work hazards, and would further be limited to simple, routine, repetitive kinds of tasks" (Tr. 48). The vocational expert testified that such an individual could not perform the plaintiff's past work as a cosmetologist or receptionist, but could perform sedentary, unskilled jobs as a charge account clerk (250 jobs statewide; 23,000 nationwide); quotation clerk (150 jobs statewide; 16,000 nationwide); or assembler (1,600 jobs statewide; 106,000 nationwide) (Tr. 48). In response to a second hypothetical further requiring that the individual be given the option to sit or stand every 30 to 60 minutes, the vocational expert testified that the added restriction would not affect the number of charge account clerk or quotation clerk jobs available, but would reduce by half the number of assembler jobs available (Tr. 48-49). The vocational expert testified that no jobs would accommodate an individual who, in addition to the limitations identified in the second hypothetical, could not

---

[6] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *See* 20 C.F.R. § 404.1567(a). Sedentary jobs also require occasional walking and standing, which generally totals no more than two hours in an eight-hour workday, as well as the ability to sit for total of approximately six hours in an eight-hour workday. *Id*.; SSR 96-9p, 1996 WL 374185, at *3.

13

concentrate for 20 percent of the workweek or would need to be absent from work more than two days per month (Tr. 49). Likewise, no jobs would be available to an individual who would further require unscheduled 20- to 30-minute breaks several times per workday or who could not sit and stand for a combined total of at least 6 hours (Tr. 50-51).

### .**ANALYSIS**

The plaintiff alleges disability commencing in April 2011 when she was 40 years old. She was 41 years old on the date of the ALJ's decision. The plaintiff has a high school education and has past relevant work as a cosmetologist and receptionist (Tr. 37, 218). The ALJ found that the plaintiff's multiple sclerosis, depression, and borderline intellectual functioning were severe impairments. The ALJ further determined that the plaintiff has the residual functional capacity to perform less than the full range of sedentary work, with the following limitations: lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; push and pull within the given weight limits; sit for up to six hours in an eight-hour workday with normal breaks; cannot climb ropes, ladders, or scaffolds; can occasionally climb ramps and stairs, balance, kneel, stoop, and crouch; cannot crawl; cannot perform overhead work; must avoid exposure to hazards such as unprotected heights and dangerous, moving machinery; must have the option to sit or stand every 30 minutes to one hour; and is limited to simple, routine, repetitive tasks. The plaintiff argues that the ALJ erred by (1) failing to consider the combined effect of her multiple impairments; and, (2) failing to properly assess her residual functional capacity ("RFC").

### *Combination of Impairments*

The plaintiff first argues that ALJ failed to properly evaluate the combined effect of her multiple impairments. When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).

Here, as argued by the Commissioner, the ALJ explicitly considered the combined effect of the plaintiff's medically determinable impairments, including the alleged side effects of her medications, and cited substantial evidence in the record to support his determination that the aggregate limitations did not meet or medically equal any listing or otherwise preclude the plaintiff from performing a significant number of sedentary, unskilled jobs (Tr. 16-24). Specifically, the ALJ noted the plaintiff's ability to engage in daily and social activities that are inconsistent with her claimed physical and mental limitations (Tr. 17 (citing Tr. 38, 199-210, 249-59, 389-90)). Moreover, clinical examinations revealed only mild limitations with respect to memory and concentration (Tr. 17 (citing Tr. 389-92)), as well as normal strength, vision, sensation, coordination, and gait (Tr. 20, 22 (citing Tr. 286, 330-31, 349, 351, 355, 397-98)). From these medical signs, the ALJ appropriately concluded that the plaintiff's combined impairments did not produce functional limitations severe enough to meet or medically equal Listings 2.02-2.04 (Visual Impairments), 11.09 (Multiple Sclerosis), 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), or 12.05 (Mental Retardation).

As the ALJ noted, from June 2010 through January 2012, doctors consistently described the plaintiff's multiple sclerosis as "stable" (Tr. 19-20, 22 (citing Tr. 329, 331, 333, 342-43, 351, 400)). Despite the lack of longitudinal treatment records supporting any functional limitations related to depression or borderline intellectual functioning, the ALJ gave the plaintiff the benefit of the doubt by limiting her to simple, routine, repetitive tasks

consistent with unskilled work (Tr. 20-21, 24 (citing Tr. 330, 334-35, 350-51, 389-92)). As the ALJ specifically noted, the plaintiff denied being depressed until she attended her consultative examination with Dr. Fishburne, and, while Dr. Fishburne diagnosed depression, he found a GAF score of 70, indicating only mild symptoms (Tr. 20 (citing Tr. 389-92). Furthermore, she had previously managed to perform skilled and semi-skilled jobs as a cosmetologist and receptionist despite her claimed inability to remember things, stay on task, and understand and follow instructions (Tr. 21 (citing Tr. 47-48, 330, 334-35, 350-51; Tr. 207, 257)). Although the ALJ pointed out that the plaintiff's statements regarding the debilitating side effects of her medication were inconsistent with other evidence in the record (Tr. 20 (citing Tr. 38, 377, 390-91, 395, 397)), he nevertheless accounted for these reported effects by restricting her exposure to workplace hazards (Tr. 23).

The plaintiff also makes a conclusory, one sentence argument that the combined effect of her impairments and the side effects of her medications medically equal the criteria of Listing 11.09 (pl. brief at 10). However, she cites neither the criteria of the listing on which she relies nor the specific clinical findings that she contends are "equal in severity" to those criteria. As noted above, the ALJ specifically considered Listing 11.09 and found that the record does not contain evidence of (A) the significant and persistent disorganization of motor function; (B) the visual and mental deficits; or (C) the significant, reproducible fatigue of motor function and substantial muscle weakness that Listing 11.09 requires (Tr. 16-17). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.09. Substantial evidence supports the ALJ's finding.

Based upon the foregoing, the plaintiff's allegations of error in this regard are without merit.

16

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ's RFC assessment was flawed because he did not properly evaluate her credibility nor did he properly evaluate Dr. Bahadori's January 2012 opinion that she suffered from physical and mental limitations that would preclude all work.

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step
> of the test, "[t]his is not to say, however, that objective medical
> evidence and other objective evidence are not crucial to
> evaluating the intensity and persistence of a claimant's pain
> and the extent to which it impairs her ability to work. They most
> certainly are. Although a claimant's allegations about her pain
> may not be discredited solely because they are not
> substantiated by objective evidence of the pain itself or its
> severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective
> evidence of the underlying impairment, and the extent to which
> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at

*4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The plaintiff argues that her "symptoms are well-documented; stem [from] a medically determinable impairment; [and] are recognized and treated over time by her physicians" (pl. brief at 10).  She further contends that the ALJ "improperly found [her] complaints inconsistent rather than slowly intensifying" and "focused on some notes and discarded others" (*id.* at 11).

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely

19

credible (Tr. 19-21).  In his credibility analysis, the ALJ noted that the plaintiff's complaints of disabling symptoms were inconsistent with:

> (1) her other statements in the record regarding the severity of her symptoms, including dizziness, facial numbness, insomnia, medication side effects, and depression (Tr. 20 (citing Tr. 287, 330, 334-35, 341, 343, 348-49, 372, 374, 377, 391, 395, 397));
>
> (2) her failure to appear for scheduled testing to address her reported dizziness (Tr. 20 (citing Tr. 377));
>
> (3) objective medical findings showing normal physical and mental functioning (Tr. 20-22 (citing Tr. 286, 290, 330-31, 349, 351, 355, 390-91, 397-98));
>
> (4) her reported daily activities, e.g., driving, attending church, attending to personal care, preparing simple meals, shopping, doing some housework (Tr. 17, 21 (citing Tr. 38, 199-210, 249-59, 389-90));
>
> (5) Dr. Fishburne's observation that the plaintiff was not entirely forthcoming during her consultative examination (Tr. 21 (citing Tr. 390-91)); and
>
> (6) the weight of the medical opinion evidence (Tr. 21-24 (citing Tr. 318-25, 399-405)), including numerous observations that her multiple sclerosis was "stable" (Tr. 20, 22 (citing Tr. 329, 331, 333, 342-43, 351)).

Based upon the foregoing, the undersigned finds that the ALJ's credibility determination was free of legal error and based upon substantial evidence.

The plaintiff further argues that the ALJ erred in his evaluation of Dr. Bahadori's treating source opinion, arguing that "the ALJ went out of his way to discard all of his limitations one-by-one" (pl. brief at 12).  The plaintiff also notes that Dr. Bahadori is a specialist in the relevant field and has a longitudinal relationship with her (*id.*).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the

20

treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Here, the ALJ gave "little weight" to Dr. Bahadori's opinion. In doing so, the ALJ spent several pages of the decision going over the limitations Dr. Bahadori assigned to the plaintiff. The ALJ specifically identified the numerous instances in which Dr. Bahadori's opinion conflicted with the record as a whole, including his own treatment notes (Tr. 21-23). For example, Dr. Bahadori indicated sensory disturbance, but examinations

showed intact sensation (Tr. 331, 349, 355, 360, 363; *see* Tr. 21); he indicated that the plaintiff had left side weakness, but strength examinations were grossly normal (Tr. 337, 343, 349, 351, 355, 360, 396; *see* Tr. 22); and he noted limitations in the use of the plaintiff's hands, but there was no objective evidence showing motor limitations (Tr. 399-405; *see* Tr. 22). As argued by the Commissioner, the plaintiff faults the ALJ for doing precisely what the regulations and rulings demand: to provide specific reasons for the weight given to a treating physician's medical opinion in a manner that "make[s] clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. The undersigned finds no error in the ALJ's evaluation of Dr. Bahadori's opinion.

The plaintiff further argues that the ALJ failed to consider "the extent to which [her] severe weakness and fatigue impacted [the] ultimate residual functional capacity assessment . . . " (pl. reply brief at 1). She contends that "it cannot be legitimately disputed that the medical evidence reveals that [she] first developed increasingly severe fatigue on February 18, 2011 (immediately prior to her alleged onset date) . . ." (*id.*) and that "the ALJ improperly compares evidence from before and after the onset date and presents those changes as 'inconsistencies'" (pl. brief at 12). However, in the RFC assessment, the ALJ specifically accounted for the plaintiff's fatigue in limiting her to sedentary work (Tr. 22). Furthermore, as argued by the Commissioner, the plaintiff's reported symptoms "did not suddenly materialize on her alleged onset date" (def. brief at 17). In her initial disability application, the plaintiff reported that the same symptoms, including pain, weakness, numbness, and fatigue, which she described at that time as "extreme," "excruciating," "severe," and "constant" (Tr. 172), prevented her from working as of September 28, 2009. As noted by the Commissioner, the April 2011 alleged onset date was chosen to account for the fact that the plaintiff continued to work until then (Tr. 33-36, 148). This court agrees

22

with the Commissioner that it was not error for the ALJ to consider the pre-2011 evidence in evaluating the severity of the plaintiff's symptoms through the date of the decision.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 13, 2013
Greenville, South Carolina

23